UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No.

**UNITED STATES OF AMERICA**

vs.

**DEEPAK SHARMA,**

    **Defendant.**

                                /

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorneys, and the defendant, DEEPAK SHARMA, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

1. "Company 1," an entity whose identity is known to the United States and the defendant, was a publicly-traded aviation services company based in the United States.

2. "Subsidiary 1," an entity whose identity is known to the United States and the defendant, was a wholly-owned subsidiary of Company 1 based in the United States.

3. "Subsidiary 2," an entity whose identity is known to the United States and the defendant, was a wholly-owned subsidiary of Company 1 based in the United States.

4. The defendant was a United Kingdom citizen and resident during the relevant time period. The defendant was an executive of Subsidiary 1 from approximately November 2015 through September 2019.

5. "Company 2," an entity whose identity is known to the United States and the defendant, was an aircraft leasing and trading company based in Germany.

6. "Company 3," an entity whose identity is known to the United States and the defendant, was a special purpose vehicle incorporated in Ireland and managed by Company 2.

7. "Company 4," an entity whose identity is known to the United States and the defendant, was a Hong Kong incorporated company used by Intermediary (defined below).

8. "Company 5," an entity whose identity is known to the United States and the defendant, was a United Arab Emirates incorporated company used by Intermediary (defined below).

9. Nepal Airlines Corporation ("NAC") was the state-owned flag carrier airline of Nepal. NAC was controlled by and performed government functions for and on behalf of Nepal.

10. "Intermediary," an individual whose identity is known to the United States and the defendant, was a Nepali citizen engaged by the defendant and others to facilitate bribe payments to foreign officials, including Foreign Official 1 (defined below).

11. "Individual 1," an individual whose identity is known to the United States and the defendant, was a German citizen, a director of a Company 2 affiliate outside Germany, and a director of Company 3.

12. "Foreign Official 1," an individual whose identity is known to the United States and the defendant, was a Nepali citizen who served as a high-level official at NAC from at least approximately 2015 through 2019.

13. From in or around November 2015 through in or around at least August 2018, the defendant, together with others, knowingly and willfully agreed to use the mails and means and instrumentalities of interstate commerce, to secure an improper advantage for Company 1, Subsidiary 1, and others by bribing Nepali officials, including Foreign Official 1, in order to win a bid to sell two Airbus A330-200 aircraft to NAC ("NAC Transaction").

14. In or around November 2015, the defendant attended a meeting in Nepal with Intermediary and Foreign Official 1, during which the potential NAC Transaction was discussed. Foreign Official 1 proposed that the defendant, on behalf of Company 1, engage Intermediary as a lobbyist for the potential NAC Transaction, via a company affiliated with, and nominated by, Intermediary.

15. Before NAC publicly issued a Request for Proposal ("RFP") for the NAC Transaction, Foreign Official 1 sent confidential, non-public drafts of the RFP document to the defendant, and the defendant and others at Company 1 proposed changes to the draft RFP to benefit Company 1 and Subsidiary 1 in the bidding process.

16. For example, on or about March 29, 2016, approximately six months before NAC publicly issued the RFP, the defendant forwarded an email to two executives at Company 1 containing a draft RFP that was circulated among NAC officials, including Foreign Official 1. In his email to the two executives at Company 1, the defendant stated "Please find attached Draft RFP[.] NOTE: [T]his [is] not published yet and it is strictly for three of us [a Company 1 executive], you and I to comment and change any terms to suit [Company 1]. Let me know if you want any changes made to the payment terms or bid terms so that it favours [Company 1]. I can ask these to incorporate [sic] on the RFP for publication. I am meeting with [Foreign Official 1] and Chairman this week . . . ."

17. As another example, on or about September 1, 2016, approximately one month before NAC publicly issued the RFP, Foreign Official 1 sent an email to the defendant, writing "What I have in mind is that we will specify MOU signing date, purchase agreement date and delivery date in such a way that [a competitor of Company 1] cannot meet delivery dates.

3

Following is tentative dates, and I want your feed back as to whether you can meet delivery dates . . . . Tentative dates, I personally fixed, but not yet shared with other NAC executives . . . ."

18. On or about October 30, 2016, in reference to the NAC Transaction, Foreign Official 1 sent a text message to the defendant, stating "[N]o need to worry at all. Almost all higher-ups are in our pocket."

19. On or about November 1, 2016, Subsidiary 2 entered into a Foreign Representative Agreement with Company 4, pursuant to which Company 4 would represent Subsidiary 2 on the NAC Transaction, in exchange for a commission payment of 7% of the final sale price.

20. On or about November 8, 2016, Subsidiary 1 and Company 2 entered into an agreement to prepare a joint bid for the NAC Transaction.

21. On or about November 9, 2016, while in Nepal, the defendant sent a text message to Individual 1, stating "I am having dinner with head of evaluation committee now. We are discussing how to throw others out even if they come below our bid. See you tomorrow."

22. On or about May 8, 2017, after the contract for the NAC Transaction was signed, the defendant and Intermediary facilitated the signing of a sham agreement between Company 2 and Company 4 ("Project Cooperation Agreement"), which was backdated to October 2016 (a date prior to the NAC Transaction bid submission). The agreement provided that Company 4 would assist Company 2 with preparing the bid for the NAC Transaction and in its negotiations with NAC, among other responsibilities, in exchange for which Company 2 would pay Company 4 $8,000,000. Company 4 did not provide any such services.

23. On or about July 10, 2017, the defendant and Intermediary facilitated transferring the Project Cooperation Agreement from Company 2 to Company 3, pursuant to which Company

3 would pay Company 4 $8,000,000, of which $500,000 would be paid as an advance payment, related to the NAC Transaction.

24. On or about August 9, 2017, the defendant forwarded by email a wire confirmation from Individual 1 to the personal email account of Foreign Official 1 and to Intermediary. The attached wire confirmation was for a payment made on or about August 9, 2017, on behalf of Company 3, to Company 4's bank account in Hong Kong, in the amount of 423,226 EURO, the equivalent of approximately $500,000. The defendant understood that a portion of this payment would be used to make bribe payments to Nepali officials, including Foreign Official 1.

25. In or around January 2018, after Company 4's bank in Hong Kong blocked the attempted wire transfer to Company 4, described in paragraph 24 above, the defendant and Intermediary facilitated transferring the Project Cooperation Agreement again, such that Company 3 would pay Company 5 instead of Company 4. The defendant facilitated transferring the Project Cooperation Agreement in order to ensure payments could be made for the benefit of Intermediary and Nepali officials, including Foreign Official 1.

26. On or about January 30, 2018, the defendant sent a text message to Individual 1, asking, "Do you know when is [f]irst transfer planned?" The defendant was referring to anticipated payments to Company 5 for the benefit of Intermediary and Nepali officials, including Foreign Official 1. Individual 1 responded to the defendant's text message, "We will need an invoice. Ideally for a first smaller amount. To test the waters so to speak[.]"

27. On or about April 19, 2018, in response to Individual 1's request for an invoice for "a first smaller amount," the defendant sent an email to Individual 1 with an attached invoice from Company 5 to Company 3 for $50,000 for "Service Provided for Bid and Sale of X2 A330 as an Advance[.]"

28. On or about May 15, 2018, the defendant sent Individual 1 a text message about Intermediary and Foreign Official 1 pressuring for payment of Company 5's invoice, writing, "the Nepali guys is [sic] chasing like hell."

29. On or about May 17, 2018, the defendant sent an email to Individual 1 with an attached invoice from Company 5 to Company 3 for $450,000 for "Service Provided for Bid and Sale of X2 A330 as an Advance[.]"

30. On or about May 23, 2018, in connection with the invoice referenced in paragraph 27 above, Individual 1 and others caused a wire transfer of approximately $50,000 from Company 3's bank account in Ireland, through a bank account in New Jersey, to Company 5's bank account in the United Arab Emirates. The defendant understood that a portion of this payment would be used to make bribe payments to Nepali officials, including Foreign Official 1.

31. On or about July 3, 2018, in connection with the invoice referenced in paragraph 29 above, Individual 1 and others caused a wire transfer of approximately 390,000 EURO (the equivalent of approximately $450,000) from Company 3's bank account in Ireland to Company 5's bank account in the United Arab Emirates. The defendant understood that a portion of this payment would be used to make bribe payments to Nepali officials, including Foreign Official 1.

32. In or around July and August 2018, after the two Airbus A330-200 aircraft involved in the NAC Transaction were delivered to NAC, Company 3 wired two commission payments of $3,000,000 each to Company 1's bank account in the United States, for Company 1's role in the NAC Transaction.

33. On or about August 9, 2018, Intermediary sent an email to the defendant, attaching two invoices from Company 5 to Company 3 for $1,000,000 each for "Service Provided for Bid and sale of X2 A330 as an Advance[.]"

34. On or about August 10, 2018, in connection with the invoices referenced in paragraph 33 above, Individual 1 and others caused two wire transfers of approximately $1,000,000 each from Company 3's bank account in Ireland to Company 5's bank account in the United Arab Emirates. The defendant understood that a portion of this payment would be used to make bribe payments to Nepali officials, including Foreign Official 1.

35. In total, between in or around May and August 2018, Company 3 paid Company 5 the equivalent of approximately $2,500,000 in connection with the NAC Transaction, a portion of which the defendant understood would be distributed as bribes to Nepali officials, including Foreign Official 1.

36. Separately, in South Africa, Company 1, through a subsidiary and a South Africa-based joint venture partner ("JV Partner") obtained a five-year aircraft component support contract with South African Airways Technical ("SAAT") in 2016. SAAT was a wholly-owned subsidiary of the state-owned flag carrier airline of South Africa, South African Airways ("SAA"). JV Partner, on behalf and for the benefit of Company 1, paid bribes to officials at SAA and SAAT in order to obtain and retain the SAAT contract.

37. During the bid process for the SAAT contract, the defendant received competitor information from JV Partner, which the defendant understood to have come from an SAAT official in exchange for bribe payments. For example, on or about April 18, 2016, the defendant requested and received information on competitors' bids and SAAT bid scoring from a senior person of JV Partner. The information showed that Company 1 had scored the worst in an early round bid. The defendant and others at Company 1 and Subsidiary 1 then used that confidential competitor information from SAAT to modify Company 1's later bid and win the SAAT contract.

38. During the course of the SAAT contract, on or about October 23, 2016, the defendant sent an email to another Company 1 executive regarding a potential price increase on the SAAT contract to cover a requested fee increase for JV Partner, stating, "The way to do this will be for them (SAAT) to request to us asking for change to the [fleet requirements]. … It will also look very authentic in terms of why rates went up. . . . I want to be absolute sure from [JV Partner] that this is possible before I say anything to [a Company 1 executive]."

39. During the course of the SAAT contract, SAAT paid Company 1 approximately $79.6 million. Company 1 paid JV Partner approximately $5.3 million between in or around September 2016 and January 2020, a portion of which the defendant understood was used to pay bribes to the SAA and SAAT officials involved in awarding the contract to Company 1 and JV Partner.

40. The defendant admits that some or all the proceeds personally obtained as a result of the offense described above have been dissipated by the defendant and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of this court.

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorneys, David Krakoff, Esq. and Jamie Parkinson, Esq., I agree and stipulate to this Statement of Offense. The Statement of Offense is a summary made for the purpose of providing the Court with a factual basis for my guilty plea. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime to which I am pleading guilty.

Date: 7-22-2024

_____
Deepak Sharma
Defendant

## ATTORNEY'S ACKNOWLEDGEMENT

I have read this Statement of Offense and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of Offense.

Date: 7/22/2024

_____
David Krakoff
Attorney for Defendant

Date: 7/22/2024

_____
James Parkinson
Attorney for Defendant

9